Case number 22-5334, Sandpiper Residents Association et al. Appellants v. United States Department of Housing and Urban Development. Ms. Miles for the appellants, Mr. Brewer for the appellate. Good morning. May it please the court, my name is Kimberly Brown Miles for the appellants. This case is not moved for the following reasons. The sole grounds for mootness that was presented by HUD in the district court was that because Sandpiper's owners had changed, the terms of the 2022 appropriations statute no longer provided funds for a tenant protection voucher and the funds were no longer available. That was the only grounds for mootness that was presented by HUD in the district court. HUD has the burden of showing that this argument is correct on both the facts and the law. This court reiterated in Zuckerman v. USPS that the party urging mootness has a heavy burden of establishing that a case is moot. HUD fails to meet this heavy burden. Plaintiff's concrete interest in this matter is to acquire decent, safe, and sanitary housing. This case is not moved for lack of appropriation funds. Funds for a tenant protection voucher are available under the appropriations accounting statute for fiscal years 2019 through 2021. Claimants meet the elements for vouchers for their claims that accrued during these years that would allow them to access decent, safe, and sanitary housing. HUD ignores the appropriations accounting statutes 31 U.S.C. 1552, 31 U.S.C. 1553, and 31 U.S.C. 1502B, and the equitable appropriations doctrine providing for availability of these funds. Let me ask you this question. I mean, suppose you are right and that the case is not moot in the sense that the relief that you are seeking could theoretically still be ordered and it would grant some redressability to the injuries of your client, the relief being vouchers. Yes, sir. But turning to the merits then, you still have the problem that there's been no notice of deficiency that has been issued to the current owners of the property, and that seems to be a requirement of the statute before voucher eligibility. And that's our argument, Your Honor, that there does not need to be a notice of deficiency for our clients to meet the elements for voucher relief for fiscal years 2019 through 2021 because the uncontested evidence in the record shows that the previous owner received a notice of default, and that's still within the ambit of the CAA provision. And as such, because we meet the elements for those fiscal years, that's the reason why our clients are entitled to voucher relief. Also, we want to know for the record... So you're saying that they would get vouchers from funds from those appropriations as opposed to a later appropriation? Your Honor, even for... the record has not been developed related to the current status of the project, and that is in question in terms of whether the current owner is... whether there will be further another notice of deficiency issued to the current owner. In the record at this point, the last inspection that occurred at the complex in February of 2022, and that was the last documented status of the physical conditions of the property, the owner was still... the new owner was deficient. HUD had not issued a notice of default per se, but they received an unsatisfactory HUD inspection. But I guess when you filed a lawsuit, though, I mean, you can't wait until the facts kind of turn out in your favor and then hope you can get relief then. I mean, the facts or the evidence, so to speak, is whether you're entitled to the relief, the district court is entitled to assess the evidence and the facts as of the time that one side or the other asked for judgment, right? Yes, Your Honor. So what difference does it make that in the future, a notice of delinquent deficiency might be issued? The facts in the record indicate that the complex has not met decent, safe, and sanitary standards under HUD regulations. Moreover, Your Honor, the district court, moving to our other claim under the Fifth Amendment and third housing, we set forth facts establishing a prima facie case of intentional discrimination that the district court also dismissed on mootness grounds. And we pled effective relief for that, for those claims, even though, again, the burden is not on the plaintiffs to establish that a case is moot. I want to note for the record that even though the district court did not or indicated in the decision that we did not meaningfully identify other relief, we point the court to Rule 54C, which provides that every other final judgment should grant the relief to which each party is entitled, even if the party has not defended that relief in its pleadings. Now, we don't concede that we did not meaningfully identify other relief available in our operative complaint because we did, and I'll go through that in a few moments. However, under Rule 54, we need not have specifically pled that relief for a relief to be granted for our intentional discrimination claim. If I can go into the merits of our intentional discrimination claims for a moment, HUD is funding and administering a dual segregated PBRA system in Galveston, Texas. All the white PBRA projects and white census tracts have passing HUD inspection scores, while 67% of the units in majority minority census tracts have failing HUD inspection scores. HUD pays for PBRA housing in white areas that meet HUD standards but does not do so in most of its black area PBRA projects. HUD refuses to provide the assistance to our plaintiffs that would allow them to access decent, safe, and sanitary housing. So what we pled in terms of injunctive relief is not just for tenant protection vouchers under the CAA, which we still maintain that our tenants are or our clients are entitled to. We also pledge for injunctive relief for HUD to provide decent, safe, and sanitary units in neighborhoods without substandard conditions so that our clients could access decent, safe, and sanitary housing, which they are entitled to under the Housing Assistance Payment Contract and under HUD regulation. Don't you have to plead that the reason that HUD denied the vouchers was discriminatory purpose or intent? What we have pled is that HUD is providing different standards of PBRA housing to tenants based on race. And so it's not so much just limited to access to vouchers per se. HUD is not providing black tenants decent, safe, and sanitary housing. And a similarly situated comparator is tenancy in a PBRA project. White tenants, Your Honor, do not need access to vouchers, which would allow them to access decent, safe, and sanitary housing because they already have it. So there is not going to be a similarly situated comparator where HUD is going to give white PBRA tenants vouchers and not black tenants because they are not in that situation. And what facts do you plead support or allege discriminatory purpose or intent in the way things? I understand you're saying that this is the way things are, but where's the agency's intent? So we plead that on pages 231 and 234 in the record. And the standard for the unequal conditions that I referenced is based on HUD's REAC inspection score. So we set it out by project, by race of the occupants in those projects, and by location. And in the gay office in Brazoria County locations, we set out that there are five white projects. None of those white projects have failing real estate assessments under inspection scores. That's HUD's inspection evaluation for PBRA projects. 67 percent. Are they in control of that, though? They aren't, I guess, inspect the properties. Very quickly to go over how PBRAs work. They are privately owned projects. However, they sign a contract with HUD agreeing that they will provide the tenants in that project decent, safe, and sanitary housing. And it is HUD's responsibility to ensure that those private landlords are providing that housing under HUD standards to those tenants. And HUD pays those owners a subsidy in exchange for them providing that housing. HUD is continuing to pay landlords, such as the owner of Sandpiper Cove, a subsidy while they're not providing decent, safe, and sanitary housing to the tenants in which they're housing. So the tenants signed a contract with the private landlord, that is true, but the landlord is responsible for providing decent, safe, and sanitary housing under its contract with HUD. And so the remedies that you're pleading for this discrimination, it's not just the vouchers? We are asking for voucher relief because we also cite Hills v. Sutro, which indicates in that case, a Supreme Court case, where that case stands for that a district court has the equitable authority when a constitutional violation is filed. In this case, we're pleading that HUD violated the Fifth Amendment in terms of intentional discrimination for not providing decent, safe, and sanitary housing to black tenants compared to white tenants. And in that finding, a district court has the authority to issue equitable relief to remedy that constitutional violation. So in this case, vouchers would provide those tenants with decent, safe, and sanitary housing, and they could use that mobile voucher to locate to whatever unit would take that voucher to access housing and integrated areas that are decent, safe, and sanitary. That answers your question. All right. If there's no other questions, we'll give you some time on rebuttal. Thank you. Thank you. May it please the court. Simon Brewer for the Department of Housing and Urban Development. This case is moot for exactly the reason the district court held. Events have outrun the controversy such that no effective relief is available to plaintiffs here. Following the sale of the Sandpiper Cove, there's a legal dispute about whether vouchers are an available remedy. How does that show mootness? If you're wrong about the availability of the remedy, we can address the alleged injury. If we're wrong about the availability of the remedy, then the dispute would not be moot for that reason. There's just a remedial substantive law question about whether this remedy is available in light of the appropriation. This court has treated the availability of appropriations as a mootness question, and that's because if there are no funds available to provide a remedy, then the appropriations clause forbids the court from providing effective relief. And so in cases like Shawnee Tribe, whether or not there are available funds has been treated as a question of mootness. And so for that reason, the district court treated it as a question of mootness here. It looked to the meaning of the appropriation statute, and it determined that the funds would not be available in the circumstances. But that follows from the mootness framework, not necessarily exclusively from the merits framework. I'm not sure it matters, but it just strikes me as more of a merits question. We agree. At the end of the day, if the court determines this is a merits question, it can certainly affirm on merits grounds. And the department would treat that similarly. But we think the district court got it right because of the appropriations context here. Well, why did the district court get it right? I mean, why can't the statute be read when it says that the secretary can pursue transfer project to an owner approved by the secretary under established procedures who will be obligated to promptly make all required repairs and to accept renewal of the assistance contract if such renewal is offered? Why doesn't that language obligate a successive owner to repair the property and essentially cure any notice of deficiency? The new owner is required to make the repairs to the property, and the new owner here has agreed to do that. Is the new owner required to cure the notice of deficiency? Is that what that means when you say that they're required to make repairs? No, the notice of default terminated upon sale. And that's because the notice of default is an owner specific remedy, and it serves as the predicate for other owner specific remedies in the statute. But upon the sale of the property and the transfer of the housing assistance payment contract, the new owner incurred its own obligations to HUD to provide decent, safe and sanitary housing and to make sure that the property is in a condition that satisfies its regulatory and contractual obligations. And if the new owner becomes in default of those obligations, HUD can certainly issue new owner a notice of default. But that has not happened in this case. Why is that consistent with congressional intent? I mean, it just seems like it's a way to kick the can down the road without anything getting fixed. I think Congress recognized that there may be times when pursuing transfer to a new owner who will undertake repairs is the best option for preserving one of these properties. And Congress has directed the department to take all steps reasonable to preserve these kinds of properties. But having the notice of default transfer over to the new owner or something like that would, in fact, undermine Congress's specification that transferring of the property is a remedy. Because new owners would be extremely reluctant to take on these projects that had already had notice of default issued if they could immediately face civil money penalties or debarment from federal programs that are other remedies also predicated on notice of default. So it makes sense that the new owner itself has to be in default of its obligations or those other remedies become available as to the new owner. I mean, it seems that all of those sorts of things can be dealt with in a negotiation. You know, you can stipulate that, okay, we're not going to subject you to all of these other penalties right away. We'll give you this much time. But the notice has been issued, and in the meantime, if these tenants want to move and not wait for the repairs, then we'll give them vouchers. I think Congress recognized that vouchers was one option, and it afforded HUD the ability to issue those vouchers without a requirement to issue those vouchers. But it recognized that there's a menu of enforcement choices here, of which vouchers is one, pursuing transfer of the project to a new owner is another. And the circumstances will differ. And in this case, HUD pursued transfer of the project to a new owner after trying other remedies, such as requiring the previous owner to replace the management company. Well, I mean, I guess that response is why it might be reasonable for HUD to not exercise its jurisdiction to impose these other remedies on a new owner immediately. But that doesn't really answer the question as to why legally it couldn't be permissible for HUD to allow tenants to have vouchers right away while the new owner is trying to fix the property. It's certainly true that HUD would have enforcement discretion in those circumstances. But I think the congressional scheme recognizes that the obligations imposed on owners are specific to those owners, and it didn't want to open the door to even the risk that HUD would immediately impose these kinds of entity-specific sanctions on a new owner and thereby undermine its tools. I mean, even if HUD could agree to forego those with respect to a new owner, new owners might be wary of purchasing properties. How long has this voucher scheme at issue been in place, just since 2018, or is it before that? I believe 2016 is when it was first implemented, but it may be off by a year or so. So the authority that was cited for why the notice of default doesn't transfer was, I think, a single declaration from a HUD employee. Is that all the authority you have? There's no regulation. There's no policy statement. There's no nothing else? That's correct. The HUD declaration sets forward HUD's understanding of notice of default in the enforcement scheme rates. Do we owe that any deference? We have not asked for any deference, but we think that's consistent with the language of the appropriations statute and certainly reflects HUD's experience administering the scheme and enforcing notices of default issued to owners in these types of properties across the country. I mean, if the conditions of these properties hasn't improved and it's still basically have deficiencies that endanger the health and safety of the tenants, why would it make sense to interpret the statute to deny these tenants a voucher just for the sole reason that the property has been sold? The property being sold is part of HUD's enforcement scheme of the statute. Selling the property and transferring the associated contract to a new owner that commits to making the repairs on the property that secured financing to make repairs on the property was, in HUD's view, a reasonable and economical way to conclude this enforcement action and bring the property into compliance. In certain circumstances, it could choose to issue vouchers, but it would typically do that as a last resort when other possible remedies have failed. And HUD, in its judgment, again, taking into account the conditions of the property here, had not yet been convinced that that was an appropriate step. How long did they have to make the repairs? The new owner? Yeah. I don't know that there's a specific timeline set forth in the record, but I can tell you that as of July, the repairs on the property were 85% complete, and currently the repairs are expected to be completed by November of this year. And is that in the record somewhere? That is not in the record, but certainly that would bear on if this case were remanded to the district court, the propriety of issuing a preliminary injunction. Isn't the textual basis for your argument that the statute says it's when the owner has received a notice of default? That's correct. Yeah. Judge Wilkins was just asking, what is the basis for this position that you're taking? That's exactly right, Judge Pan. It is the owner that must have received a notice of default, and at the current time, the owner has not received a notice of default, even of some prior owner. And this case comes to us in the posture of having been dismissed as moot. And I'm wondering if that's the proper way to look at this, because I think the intervening event is that there was a change of owner, but wasn't there an amended complaint that named the new owner as a defendant? And doesn't that, I guess, defeat the mootness argument, but perhaps this should be dismissed under Rule 12b-6 for failure to state a claim instead? No, Your Honor. So the same posture happened in the Del Monte case that we cite in our brief, where an amended complaint was filed after the putative mooting event, and this court decided that case on mootness grounds about whether the intervening event since the filing of the initial complaint had mooted the case. And that's exactly the same here. The intervening event occurred between the initial filing of the case and the filing of the second amended. And so the district court appropriately treated that as a mooting event. Any other questions? Your Honor, thank you. Judgment of the district court. Thank you. Thank you. Ms. Brown-Miles, I think you're out of time. We'll give you two minutes. Thank you, Your Honor. I wanted to respond to my colleague, Mr. Brewer's, some statements regarding the statutory framework of the CAA. HUD is sort of conflating the menu of options that they have against the PBRA owner upon a failing REACT score and the tenant protection vouchers. And we go into that extensively in our briefing, but I want to reiterate it here, that it is clear that under the statutory framework, HUD has about nine options in terms of enforcement options against the owner. And one of those options is to transfer the project and sell it. And I want to highlight that that new owner is under Section 219C2D. That's under the 2021 Appropriations Act, but each act reiterates sort of similar language, that the new owner is obligated to promptly make all repairs and to accept renewal of the assistance contract if such renewal is offered. In addition, HUD's own guidance emphasizes that tenant protection vouchers and its enforcement options against the owner are completely separate. So they're separate in the statutory framework. Tenant protection vouchers are in Paragraph 2 of the 2023 CAA. And again, that allows them to have the option to give tenant protection vouchers while they're working out whatever enforcement process that is going through with the owner. So again, one of their enforcement options is to abate the Section 8 contract. And typically when that happens is they cancel the contract and then the folks in order to continue to receive decent, safe and sanitary housing under their subsidy, they get vouchers. Well, the funding for voucher relief is separate. And that's why Senator Rubio, which we go into extensively in our brief, wanted this funding because it allows HUD to pursue its enforcement options and do whatever it deems to be appropriate in terms of the agency's discretion. But it allows folks to be out of those dangerous hazardous situations more quickly without having to be forced into the decision making of whether to preserve affordable housing or to maintain folks in those dangerous conditions or if they can leave out. So HUD Notice 2018-09 is on 208 to 213 of the record and the HUD Notice regarding enforcement is on 28 is HUD Notice 2018 and that's docket 40 within the record. So it's very clear that HUD can pursue both. That's why they got that additional funding. Thank you. We have your case under advisement.
judges: Wilkins, Katsas, Pan